# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

TRANS-SERVE, INC.                                  CIVIL ACTION NO. 00-1017

VERSUS                                             JUDGE S. MAURICE HICKS, JR.

UNITED STATES of AMERICA                           MAGISTRATE JUDGE PAYNE

## MEMORANDUM RULING

This matter came before the Court for a bench trial on June 14 -17 and July 7, 2004. The United States contends that during the tax years 1987 through 1996, Trans-Serve and two of its subsidiaries were "employers" as defined by the Railroad Retirement Tax Act, 26 U.S.C. § 3201 et seq. ("RRTA") and the Railroad Unemployment Repayment Tax Act, 26 U.S.C. § 3321 et seq. ("RURTA") and were thus subject to significantly higher federal employment taxes. Trans-Serve subsequently paid the taxes and, contending that it was not an "employer" under the RRTA or RUTA, petitions this Court for relief in the form of a refund. In the alternative, Trans-Serve contends that it should not be assessed any interest or penalties. In the event it is ultimately determined to be subject to RRTA and RURTA taxes, Trans-Serve seeks an offset for federal taxes paid pursuant to the Federal Insurance Contributions Act, 26 U.S.C. § 3101 et seq. ("FICA") and the Federal Unemployment Tax Act, 26 U.S.C. § 3301 et seq. ("FUTA") for the same time periods.

The returns at issue in this case are for tax years 1987-1996. During that time period, Trans-serve was audited four times: (1) tax years 1987 and 1988; (2) tax years 1989 and 1990; (3) tax years 1991 and 1992; and (4) tax years 1993 through 1996. For

each of those four time periods, the IRS provided Trans-Serve with a examination report and a thirty-day letter, which provided Trans-Serve with the basis of the tax assessment and the time period to appeal. In each of those four time periods, Trans-Serve timely filed a protest letter disputing and appealing the tax assessment. Next, during what is known as the administrative appeal process, the IRS denied Trans-Serve's protest and imposed the tax. In each period, Trans-Serve paid or secured a bond for the tax owed and filed with the IRS a refund claim. Once these claims were denied, Trans-Serve was able to file the instant lawsuit.

For the reasons which follow, the Court finds that Trans-Serve is liable as an employer pursuant to RRTA and RURTA for the calendar tax periods ending December 31, 1987 through December 31, 1996, inclusive. Trans-Serve is liable for RRTA and RURTA taxes for those time periods, along with interest and penalties. However, pursuant to 26 U.S.C. § 3503, Trans-Serve is entitled to a credit and/or refund for all taxes paid pursuant to FICA for those time periods. Likewise, pursuant to the doctrine of equitable recoupment, Trans-Serve is entitled to a credit against its RURTA tax liability for the amount of FUTA taxes paid for the same tax periods.

## FINDINGS OF FACT

### A.    KCSI and its subsidiaries.

Kansas City Southern Industries, Inc. ("KCSI") was incorporated on January 29, 1962 under the laws of the State of Delaware. Since its incorporation in 1962, KCSI has been a holding company owning between 90 and 110 subsidiaries in various tiers which have operated in several lines of business including transportation, financial asset management, pharmaceutical, leasing, lumber and railroad ties, maintenance and repair, fiber optic communications, and information and transaction processing. Trans-Serve, Inc.

is a corporation duly organized on November 8, 1965 and validly existing under the laws of the State of Delaware with its principal office and place of business during the calendar years 1980 through 1996 in the City of Vivian, Caddo Parish, Louisiana.

Southern Group, Inc. was incorporated on December 12, 1983 under the laws of the State of Delaware and remained a Delaware corporation until it was merged into the Kansas Southern Railway Company ("KSCR") on January 6, 2000. From December 31, 1983 until December 31, 1986, Trans-Serve was a second-tier subsidiary of KSCI because it was owned by Southern Group, which in turn was owned by KCSI. On December 31, 1986, Southern Industrial Services, Inc. ("SIS") acquired all issued and outstanding shares of Trans-Serve stock, which it held until December 31, 1996.

From January 1, 1987 until August 31, 1987, Trans-Serve was a third-tier subsidiary of KCSI because it was owned by SIS, which in turn owned by Southern Group, which in turn was owned by KCSI. On August 31, 1987, KCSI acquired all issued and outstanding shares of SIS. Accordingly, from August 31, 1987 through December 31, 1996, Trans-Serve was a second-tier subsidiary of KCSI because it was owned by SIS, which in turn was owned by KCSI.

KSCR was incorporated in 1900 under the laws of the State of Missouri and remains a Missouri corporation today. Since 1984, KSCI has owned between 99.6% and 100% of the issued and outstanding common stock of KCSR, and 100% of the issued and outstanding preferred stock of KCSR. At all times material to this suit, KCSR was a Class I railroad and operated a rail carriage business over several thousand miles of main and branch rail lines running through a multi-state area in the southern and central United States.

The Court adopts and incorporates by reference herein the findings from its March 31, 2004 Order and Memorandum in which it granted the United States partial summary judgment finding that Trans-Serve is under common control with a carrier for the purposes of Section 3232(a) [see Doc. Nos. 122, 123].

**B.      Trans-Serve.**

Between December, 1980, and December 31, 1996, Trans-Serve operated the following three divisions or departments.  From 1982 through sometime in 1997, Trans-Serve operated a division under the name Fleet Maintenance headquartered in Vivian, Louisiana until 1989, when it moved to Shreveport, Louisiana, which was engaged in the business of providing repair and maintenance of vehicles.  From 1984 through July, 1988, Trans-Serve operated a division under the name ST&T Sawmill ("Sawmill") headquartered in Mansfield, Arkansas, which was engaged in production of lumber and wood products. From December, 1980 through the current date, Trans-Serve operated a division under the name Superior Tie & Timber, based in Vivian, Louisiana, which was engaged in the manufacture of treated wood railroad ties.

### 1.      Fleet Maintenance.

The Fleet division provided repair and maintenance to hyrail vehicles owned by KCSR and vehicles for other subsidiaries of KCSI, and unrelated third parties.  The type of work performed by Fleet generally included washing and detailing vehicles, changing oil and general engine repair.  The Fleet division was initially based in Vivian, Louisiana and operated out of a warehouse on Trans-Serve's tie plant.  In 1989, Fleet operations moved to and operated from a building in Shreveport, Louisiana which was leased by Trans-Serve from KCSR pursuant to a written lease dated June 1, 1989 (the "Lease").  The Lease negotiated between Trans-Serve and KCSR was at arms length with a fair market value

rent.  Except for the general manager of Trans-Serve and certain administrative staff having responsibility for all divisions, the employees performing repair and maintenance work for the Fleet division did not work for any other division of Trans-Serve.

Commencing in 1989, KCSR and KCSI engaged Gelco, Inc. (later G. E. Capital Fleet Services), an unrelated company, to supervise repairs to its vehicles and to maintain detailed repair records for each vehicle.  Commencing in 1989, the Fleet division responded to Gelco personnel and billed them for the repair and maintenance work on vehicles owned by KCSI and its subsidiaries.  During the calendar years 1984 through 1996, the revenues derived from the Fleet division accounted for 3% to 15.16% of total revenues earned by Trans-Serve during said years, with the average percentage for said years being 7.96%.  During the years 1984 through 1996, Fleet's revenues were derived not only from KCSR and its Rail Subsidiaries, but also from KCSI, its other subsidiaries, and third parties.

### 2.    *Superior Tie & Timber (ST & T).*

The manufacture and treatment of wood railroad ties was not an activity traditionally or historically undertaken by railroads, but rather railroads generally purchased wood ties from third party manufacturers and suppliers.  The tie manufacturers constituted a separate industry and formed a trade association known as the Railroad Tie Association.  Both prior to and after the construction of Trans-Serve's tie manufacturing plant, KCSR and its Rail Subsidiaries would generally procure from various sawmills hardwood lumber cut roughly to the approximate length, width and depth of a railroad tie.

A railroad tie is approximately nine feet long, nine inches wide and seven inches in depth, although the length varies depending on the specifications required by the railroad and whether the tie is to be used for a cross tie, bridge tie or switch tie.  Both prior to and

after the construction of Trans-Serve's tie manufacturing plant, KCSR would deliver or cause this rough-cut lumber (or "green ties") to various tie manufacturing facilities operated by Kerr McGee, Koppers, ST&T and other third party tie manufacturers. The third party tie manufacturers would convert the raw lumber into a finished useable railroad tie. During the mid to late 1970's, KCSR and its Rail Subsidiaries were not satisfied with the quality of finished ties which they were receiving from its tie manufacturers and suppliers, and also had difficulty obtaining finished ties on a timely basis.

In November of 1978, the director of purchasing for KCSR made a presentation to the Board of Directors of KCSI proposing that KCSI enter into the business of manufacturing and treating railroad ties. At the time of the proposal to enter into a tie manufacturing business, KCSI was a diversified holding company owning numerous operating subsidiaries in various lines of business. In November of 1978, the KCSI Board of Directors approved the proposal to construct a tie manufacturing and treatment plant which would produce high quality railroad ties which would be sold to all railroads, including KCSR and its Rail Subsidiaries, at a profit. The officers of KCSI delegated to Marshall Dean, the President of Trans-Serve the task of constructing a tie manufacturing and treatment plant. At the time KCSI made the decision to further diversify its business by constructing a tie treatment and manufacturing plant, Trans-Serve was an inactive corporation that then had no business activity.

Trans-Serve was chosen as the entity which would own, construct and operate the tie treatment and manufacturing plant. The decision was made that the tie treatment and manufacturing plant should be built on land located in the City of Vivian, Caddo Parish, Louisiana, which was adjacent to KCSR's main railroad line (the "Land"). The Land was

owned by Rice Carden Corporation, which was then a wholly owned subsidiary of KCSI which held numerous parcels of real estate in Arkansas, Louisiana, Missouri and Texas.

In 1979, Rice Carden Corporation deeded the Land to Trans-Serve which subsequently commenced construction of its tie treatment plant on such Land. The construction of Trans-Serve's tie manufacturing and treatment plant was financed through industrial revenue bonds issued by the applicable municipality for the benefit of Trans-Serve. KCSI guaranteed the obligations of Trans-Serve under the industrial revenue bonds.

The tie plant operated under the name of "Superior Tie and Timber." Charles Vaughan was selected to be the general manager of the tie plant in 1980. Mr. Vaughan was formerly employed by KCSR as a tie purchaser and was familiar with the process of purchasing raw lumber and converting such lumber into finished usable railroad ties. From December, 1980 through December 31, 1996, Mr. Vaughan was the only employee of Trans-Serve who had formerly been employed by KCSR or its Rail Subsidiaries. From December, 1980 through December 31, 1996, all other employees needed and hired for the tie plant were hired locally and had no previous relationship with KCSR or its Rail Subsidiaries. From December, 1980 through December 31, 1996 no employees of KCSR or its Rail Subsidiaries ever performed work for ST&T and no employee of ST&T ever performed work for KCSR or its Rail Subsidiaries.

At the time KCSI approved the proposal to construct a tie manufacturing plant KCSI wanted the tie plant to manufacture and sell ties not only to KCSR and its Rail Subsidiaries,

but also to other major railroads. Trans-Serve's tie manufacturing plant was specifically designed and constructed to produce 1,000,000 ties per year, with a capability of expanding the plant to produce 2,000,000 ties per year. At the time Trans-Serve's tie manufacturing plant was approved and constructed, it was estimated that between 400,000-500,000 ties would be sold to KCSR and its Rail Subsidiaries annually, with the balance of the capacity being sold to other unrelated railroads.

The tie manufacturing process at ST&T generally consisted of the following processes: The raw lumber or green tie would be delivered to the plant and loaded on a conveyor belt by ST&T employees. The raw lumber would then pass through a cutting device which would cut the lumber to exact length specifications for the type of tie to be produced. The raw lumber after being cut would continue on the conveyor and be separated and graded, and any lumber not of proper grade would be rejected. The raw lumber not rejected would continue to move by conveyer through a Adze and Boring mill and perforating machine which would drill holes in the tie for the track spikes and make many small holes in the lumber to facilitate drying. The perforated lumber would then pass through a machine where metal tie plates would be affixed to each end of the tie to prevent end splitting. The lumber would then be cross stacked in such a way to facilitate air drying and stored at the plant site for a period of six to nine months to be air dried. After the drying process was complete the ties would be stacked on carts which would move through a cylinder chamber where creosote would be injected into the tie under high pressure for several days. The ties would then be removed from the chamber and stacked for final drying and delivery to the customer. After the green tie had been processed and treated with creosote, it became a usable railroad tie that could be installed in a railroad track bed and last many years. A green tie which had not been manufactured and processed into

a fully-treated and usable railroad tie would rot and decay very quickly and would not be suitable for use in a railroad track.

From 1980 through December 31, 1996, Trans-Serve prepared at least two sales brochures which were used to actively marketed its ties to railroads other than KCSR. During the years 1980 to 1985, Trans-Serve also advertised every month in the "Railway Tie" magazine. During the period 1980 to 1985, Trans-Serve specifically hired marketing personnel with contacts in the railroad industry to further its sales to customers other than KCSR and its Rail Subsidiaries. During the period January 1, 1984 through December 31, 1996, Trans-Serve sold its ties to various railroads other than KCSR and its Rail Subsidiaries.

During the period January 1, 1984 through December 31, 1996, the percentage of revenue derived by Superior Tie & Timber from KCSR and its Rail Subsidiaries and unrelated railroads and customers was as follows:

| Year | KCSR | Unrelated Customers |
|---|---|---|
| 1984 | 11.43% | 88.57% |
| 1985 | 13.19% | 86.81% |
| 1986 | 50.33% | 49.67% |
| 1987 | 80.64% | 19.36% |
| 1988 | 82.02% | 17.98% |
| 1989 | 91.36% | 8.64% |
| 1990 | 84.47% | 15.53% |
| 1991 | 87.26% | 12.74% |
| 1992 | 63.26% | 36.74% |
| 1993 | 94.00% | 6.00% |
| 1994 | 95.77% | 4.23% |
| 1995 | 84.86% | 15.14% |
| 1996 | 86.55% | 13.45% |
| Average for All Years | 71.16% | 28.84% |

KCSR and Trans-Serve entered into an agreement dated January 1, 1980 (the "Agency Agreement"), which authorized Trans-Serve to act as agent for KCSR to purchase raw lumber to be used in the manufacture of railroad ties. During the years 1980 to 1996, KCSR's director of purchasing would submit annual purchase orders to Trans-Serve specifying the number of ties KCSR expected to purchase from Trans-Serve during the coming year. The annual purchase orders were necessary for Trans-Serve to schedule its production cycle given the six to nine month drying period required to complete the tie treatment and manufacturing process. The ties covered by the annual purchase order would be manufactured by Trans-Serve during the course of the year and delivered to KCSR on a periodic basis.

During the years 1980 through 1996, the raw lumber ordered by Trans-Serve pursuant to the Agency Agreement was paid for by KCSR either by a draft signed by Trans-Serve until about 1990 and thereafter by a billing by Trans-Serve to KCSR and payment by KCSR to Trans-Serve or directly to the sawmills. Where Trans-Serve purchased raw lumber for KCSR under the Agency Agreement, KCSR would have title to the lumber. During the years 1980 through 1996, Trans-Serve in some cases would purchase the raw lumber for KCSR under the Agency Agreement and would process such raw lumber into a finished tie. In these cases, Trans-Serve would bill KCSR for its processing costs, plus profit, plus a 5% charge for procuring and handling the raw lumber.

During the years 1980 through 1996, Trans-Serve in other cases would sell finished (black) ties to KCSR where the raw lumber was owned paid for and procured by Trans-Serve. In these cases, Trans-Serve's billing to KCSR would be at a price which would include the cost of the raw lumber plus a mark up thereon, treating costs plus a profit. The process of treating and manufacturing ties for KCSR by Trans-Serve was similar to the

procedure which KCSR had effected with other third party tie treatment plants prior to Trans-Serve's construction of its tie manufacturing and treatment plant. During the tax periods at issue, Trans-Serve handled and manufactured railroad ties for other railroads in the same fashion as it handled ties for KCSR where the railroad would supply the raw lumber and also on the basis where Trans-Serve would acquire and pay for the raw lumber and sell a finished treated tie to the railroad.

During the tax periods in issue, Trans-Serve would charge KCSR the same price for tie treatment costs as it charged other railroads. During the tax periods in issue Trans-Serve sold KCSR the raw lumber or green tie at its cost plus 5%. During the tax periods in issue, Trans-Serve sold unrelated railroads the raw lumber or green tie at its cost plus a mark up.

During the years 1983 through 1996, Trans-Serve had its own management, kept its own personnel records, procured its own insurance, paid its own employees, prepared its own payroll tax returns and from 1989 maintained its own accounting records at its principle office. During the years 1980 through 1996 Trans-Serve would prepare its own budget and submit it to Southern Group or Southern Industrial Services or KCSI for approval. As with all of KCSI's subsidiaries, Trans-Serve and KCSR operated independently as profit centers and were subject to general oversight by their respective parent corporations.

## CONCLUSIONS OF LAW

As with any tax case, one must distinguish the mere avoidance of taxes from legally circumscribed tax evasion. Avoiding a tax by remaining outside the ambit of the law that imposes it is every person's right. "Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible.

Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant." <u>Commissioner v. Newman</u>, 159 F.2d 848, 850-851 (2nd Cir.)(L. Hand, J., dissenting), *cert. denied*, 331 U.S. 859, 67 S.Ct. 1755, 91 L.Ed. 1866 (1947).

It is our task to evaluate whether the reach of the RRTA extends to include operations such as these performed by the railroad's subsidiaries. Railroads are required to pay significantly higher federal employment taxes than other employers to finance benefits accorded to the industry by the Railroad Retirement Tax Act ("RRTA") and the Railroad Unemployment Repayment Tax Act ("RURTA"). The benefits derived from these acts are promulgated by the Railroad Retirement Act, 45 U.S.C. § 231 (hereinafter "RRA") and the Railroad Unemployment Insurance Act, 45 U.S.C. § 351 (hereinafter "RUTA"). Anticipating that railroad firms would seek to "escape these onerous levies," Congress broadened the definition of an employer under the RRA to include more than the primary freight and passenger carriers. <u>See, e.g.</u>, <u>Livingston Rebuild Center v. Railroad Retirement Board</u>, 970 F.2d 295, 296 (7th Cir. 1992); <u>Standard Office Building v. United States</u>, 819 F.2d 1371, 1373 (7th Cir. 1987).

## I.    Liability as an "Employer" Under RRTA and RURTA.

For the purposes of the RRTA and RURTA, the term "employer" is defined, in pertinent part, as "any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, *and* which operates any equipment or facility or performs any service... in connection with the transportation of

passengers or property by railroad..." 26 U.S.C. §3231(a) (emphasis added).[1]  This is a two-pronged test that requires both ownership/control by the carrier *and* service to the carrier.  Since the Court has already granted the IRS partial summary judgment finding that Trans-Serve is under common control with a carrier for the purposes of Section 3232(a) [see Doc. Nos. 122, 123], the Court will turn its attention to whether  Superior Tie & Timber and/or Fleet Maintenance performed "a service" in connection with the transportation of passengers or property by the railroad.

### A.    Superior Tie & Timber

### 1.    Performed a "Service."

There is no definition in the statute or relevant regulations to guide the court on what constitutes a "service" in this context.  The question before the Court is a matter of first impression in this circuit.  However, the Eleventh Circuit has held that a subsidiary which provided cross-ties to the parent carrier was indeed performing a service.  Railroad Concrete Crosstie Corp. v. Railroad Retirement Board, 709 F.2d 1404 (11th Cir. 1983). In that case, the subsidiary paid for all of the materials used in the cross-tie manufacturing process.  Although the parent would weld the steel frames used by the subsidiary, it was billed for the items it purchased.  Although the subsidiary did sell cross-ties to third parties, approximately 90% of its output was sold to the parent carrier.  Like Trans-Serve, Railroad Concrete Crosstie argued that the manufacture of crossties could not be construed as a "service" since it produced a tangible commodity.  However, the Eleventh Circuit found that

---

[1]The definition of employer used in the RRA and RUTA is similar to that which is used in the RRTA and RURTA and with regard to all of these acts, the courts and the IRS have held that "the identical definition in these related Acts should be identically construed and applied." Universal Carloading & Distributing Co. v. Pedrick, 184 F.2d 64,65 (2d Cir. 1950), cert. denied, 340 U.S. 905 (1950).

provision of a steady, dependable supply of an essential item was indeed a service.  Id. at 1408.

Two years later, the IRS specifically adopted the Eleventh Circuit's decision, stating in a Revenue Ruling:

> In situations similar to that in Railroad Concrete Crosstie Corp., in which a wholly owned subsidiary manufactures an item that is integral to the railroad operations of an employer affiliate and provides substantially all of its output to the employer affiliate, the taxes imposed by the Railroad Retirement Tax Act are applicable.

Rev. Rul. 85-1977, 1985 WL 287238.  Although not binding, the Fifth Circuit generally accords significant weight to the determinations of the IRS in its revenue rulings. St. David's Health Care System v. U.S., 349 F.3d 232, 239 n.9 (5th Cir. 2003)(citing Estate of McLendon v. Commissioner, 135 F.3d 1017, 1023 n. 10 (5th Cir.1998)).

Trans-Serve argues that the instant matter is different than Railroad Concrete Crosstie Corp., since it is not a wholly owned subsidiary, does not lease from the parent, and has its own accounting and administrative offices.  However, those differences speak to the parent's control over the subsidiary, not to the characterization of the services the subsidiary provides to the parent.  Here, we have a subsidiary under common control with a carrier, which provides over 70% of its cross-ties to the parent.  Although approximately 30% are sold to third-parties, Superior Tie & Timber must first provide the needs of KCSR at a commission rate half the industry standard before selling ties to other companies.

Although the Court finds that Superior Tie & Timber provides a service to the carrier by the provision of a steady, dependable supply of essential items to a parent railroad, the Court also finds that it provided other services to the carrier.  Specifically, the "receiving, storing and treating of railroad ties" for the benefit of the carrier.  The subsidiary in Railroad

Concrete Crosstie Corp. owned its own manufacturing materials and only sold the ultimate product, the finished crossties.  Here, Superior Tie & Timber purchases green-ties on behalf of the carrier, stores them, treats them, transports them and then delivers them to the railroad all for a fee.  Accordingly, the Court finds that Superior Tie & Timber in fact performs multiple services for the carrier in addition to the provision of a steady, dependable supply of essential items, i.e. chemically treated railroad ties.  The fact that one of those services may result in a new "product" does not change the fact that services are indeed provided.

**2.      *"In Connection with" Rail Transportation.***

The Court finds that Superior Tie & Timber provides services "in connection with" rail transportation.  Regulations promulgated under the RRA consider a service to be rendered in connection with the transportation of passengers or property by railroad if "such service . . . is reasonably directly related, functionally or economically, to the performance of obligations which a company or person or companies or persons have undertaken as a common carrier by railroad . . . .  20 C.F.R. § 202.7.

In Railroad Concrete Crosstie, supra, the Eleventh Circuit held that rail ties are critical to rail carriage, explaining that "the only other product that is as integral to the operation of a railroad is the rolling stock itself."  Id., 709 F.2d at 1408.  As noted above, that decision was adopted by the IRS in Revenue Ruling 85-1977, which rulings are generally accorded significant weight.  See  St. David's Health Care System v. U.S., 349 F.3d 232, 239 n.9 (5th Cir. 2003)(citing Estate of McLendon v. Commissioner, 135 F.3d 1017, 1023 n. 10 (5th Cir.1998)).

Other courts have tinkered with tests for determining whether a service is functionally or economically reasonably directly related to the performance of railroad

obligations such as whether the service is either covered by the Interstate Commerce Act or whether the service could be charged under the line haul tariffs.  See, e.g., ITEL Corp. v. Railroad Retirement Board, 710 F.2d 1243, 1246 (7th Cir. 1983) (leasing activities were not services because such services were broader than those covered by the ICA); Atlantic Land & Equipment v. US, 790 F.2d 853 (11th Cir. 1986)(longshoremen hired to transfer phosphate from rail cars were providing services because the applicable tariff charge by the railroad included this service).  But the ICA standard employed in ITEL is inadequate, since as Judge Easterbrook notes, "[n]either the text of the statute nor the legislative history supports that approach..." Livingston, 970 F.2d 295, 298.  The use of the ICA (which limits 'distinct rail services' to terminal charges, storage charges, and icing charges) is merely one factor in determining whether a service is in connection with railroad transportation, not the sole consideration.

Finally, and crucially, the Court in Duquesne clearly rejects a reliance on the ICA.[2] "It is not whether the affiliate would itself be subject to the Interstate Commerce Act.  It is whether a carrier's affiliate is performing a service that could be performed by the carrier and charged for under the line-haul tariffs."  326 U.S. 446, 454.  Following this analysis, Easterbrook concludes along with the Court in Duquesne that:

> the acts apply whenever 'a carrier's affiliate is performing a service that could be performed by the carrier and charged for under the line-haul tariffs.'...Rebuilding locomotives is a service that 'could be performed by the carrier'...[and the] cost is rolled into the line-haul tariffs, just as the expense of engineers and track repair is included.

Livingston, 970 F.2d 295, 298.

---

[2]  The Interstate Commerce Act no longer exists.  It was superseded by the Surface Transportation Board in 1996.

According, whether analyzed under its plain-meaning as in <u>Duquesne</u> or through the tariff test, Superior Tie & Timber's operations are sufficiently connected with rail transportation to satisfy the relevant statutes.

**B.     Fleet Maintenance.**

Fleet Maintenance services hyrail and other rail maintenance equipment which is used to transport employees from place to place along the line for railroad inspection purposes.   Trans-Serve concedes that Fleet Maintenance is providing a "service" but argues that it is not "in connection which" rail transportation since these operations are not directly functionally related to the railway's transportation of freight within the meaning of 20 C.F.R. § 202.7.

In <u>Livingston</u>, <u>supra</u>, the issue was whether the rebuilding of locomotives was so related to railroad transportation.   "On textual grounds, [the] answer is inevitable.   How could the rebuilding of locomotives not be "in connection with" railroad transportation?   What produces that locomotion, other than a locomotive?  . . . .  Without functioning engines, a railroad cannot move people or freight."  <u>Id.</u>, 970 F.2d at 297.  In the present case, one can ask a similar question:   What do those locomotives run on, other than functional rail lines?  Without functioning rail lines, a railroad cannot move people or freight. The ability to maintain the vehicles that inspect the track for decaying ties or other serious deficiencies is essential to maintaining rail transportation.   The Court finds this interpretation to be reasonable.   The safeguard for preventing this interpretation from perpetually expanding coverage is the fact that the service must be provided by an entity that is owned by or under common control with a carrier.  That being the case, the Court finds that under the circumstances of this case, Fleet Maintenance is an employer under the applicable statutes.

For the foregoing reasons, the Court finds as a matter of fact and law that both the Superior Tie & Timber and Fleet Maintenance divisions of Trans-Serve are "employers" subject to the provisions of the RRA and RUTA.  As such, Trans-Serve is not entitled to a refund for any RRTA or RURTA taxes which it has paid since it is liable for payment of those taxes pursuant to this ruling.

## II.    Interest.

Trans-Serve is liable for any interest accrued on its RURTA tax liabilities.  However, whether it is liable for any interest accrued on its RRTA tax liabilities is at issue. 26 U.S.C. § 6205 provides, in pertinent part, that if less than the correct amount of RRTA tax imposed is paid with respect to any payment of wages or compensation, "proper adjustments, with respect to both the tax and the amount to be deducted, shall be made, *without interest*, in such manner and at such times as the Secretary may by regulations prescribe." (Emphasis added).  Trans-Serve concedes that Section 6205 does not apply for the tax periods 1987 to 1992, since the RRTA taxes were assessed before Trans-Serve paid the tax.  However, Trans-Serve contends that Section 6205 does apply to the tax periods from 1993 to 1996.  However, the IRS found in a Revenue Ruling that interest free adjustments would not be allowed in cases such as this in which a taxpayer's return for prior years were audited and additional tax found to be due with respect to the same issue.  See Rev. Rul. 75-464.  Although not binding, the Fifth Circuit generally accords significant weight to the determinations of the IRS in its revenue rulings.  St. David's Health Care System v. U.S., 349 F.3d 232, 239 n.9 (5th Cir. 2003)(*citing* Estate of McLendon v. Commissioner, 135 F.3d 1017, 1023 n. 10 (5th Cir.1998)).  Accordingly, the Court finds that Trans-Serve is liable for interest on its accrued RRTA and RURTA tax liabilities pursuant to 26 U.S.C. § 6601.

### III.    Penalties.

The Court must also determine whether Trans-Serve is liable for failure-to-pay penalties pursuant to Section 6651(a)(3) for tax periods 1987 through 1992. The United States also seeks statutory interest accrued on the failure-to-pay penalty assessments for periods 1987 and 1988. Trans-Serve contends that the assessment of penalties under Section 6651 for the years 1987 to 1992 is time-barred under Sections 6501(a) and 6665(a)(1) since the penalties were not assessed at the time the underlying taxes were assessed. Alternatively, Trans-Serve argues that it is not liable for penalties because its failure to pay was due to reasonable cause and not willful neglect.

Although the liability for failure-to-pay penalties arises immediately upon the failure to pay the tax on time, the debt for penalties is payable only upon notice and demand. First National Bank in Palm Beach v. United States, 591 F.2d 1143 (5th Cir. 1979).[3] Trans-Serve argues that since Section 6665(a) provides that penalties shall be assessed, collected, and paid in the same manner as taxes, then the assessment of penalties should be subject to the three-year statute of limitations which generally governs the assessment of taxes under Section 6501. This same argument was made by the taxpayer in United States v. Krasnow, 548 F.Supp. 686 (S.D.N.Y. 1982). In a very well-reasoned opinion, Judge Lasker rejected the taxpayer's argument and found that penalties, which are automatic upon failure to pay within a prescribed time, are not subject to the three-year limitations period.[4] This Court agrees. Adopting the reasoning of the Krasnow court, the

---

[3]Accordingly, interest on the penalties does not begin to accrue until after notice and demand is given. 26 U.S.C. § 6601(e)(2); In re John Hathaway Evans, Jr. v. United States, 173 B.R. 725 (D. Colo. 1994).

[4]While none are binding on this Court, the Krasnow decision has been cited favorably by several authorities. See, e.g., Bob Hamric Chevrolet, Inc. v. US, 849 F.Supp. 500 (W.D. Tex. 1994); US v. Bentley, 1991 WL 315126 (E.D. Mo.); Fed. Tax Coordinator

Court finds that the United States' claim for penalties is not time barred.[5]

The Court must now address Trans-Serve's defense that its failure to pay was due to reasonable cause and not willful neglect. According to the Treasury regulations, a failure to pay will be considered to be due to reasonable cause if the taxpayer can establish that it exercised ordinary business care and prudence in providing for payment of its tax liability and was nevertheless unable to pay the tax or would suffer an undue hardship if it paid on the due date. Treas. Reg. § 301.6651-1(c)(1). Trans-Serve has not introduced any evidence that it was unable to pay the tax. To the contrary, Trans-Serve argues that it had a *bona fide* dispute over its liability for the tax.

Specifically, Trans-Serve argues that it had "reasonable cause" for its failure-to-pay because it treated its employees in a manner consistent with a prior IRS determination that it was not a railroad employer for the tax periods from 1983 to 1986. However, the Fifth Circuit has held that a taxpayer cannot establish reasonable cause for failure-to-pay based upon purported reliance on advice from IRS personnel. See Posey v. United States, 449 F.2d 228 (5th Cir. 1971); see also United States v. Red Stripe, 792 F.Supp. 1338, 1345 (S.D.N.Y. 1992). Further, a taxpayer's mistaken understanding of the law or its obligations thereunder cannot constitute reasonable cause for its failure to pay. See, e.g., Downing v. Commissioner, 118 T.C. 22, 29 (T.C. 2002). Thus, Trans-Serve's *bona fide* dispute as to its tax liability does not constitute "reasonable cause" pursuant to Section 6651 for its failure to pay the tax owed. Accordingly, the Court finds that Trans-Serve is liable for failure-to-pay penalties.

---

¶ T-4027 (2d.); 47B C.J.S. Internal Revenue § 831.

[5]The defense of laches simply does not apply to the United States. See United States v. Arrow Transportation Co., 658 F.2d 392, 394 (5th Cir. 1980).

## IV.   Credits.

Trans-Serve seeks a credit for any FICA and FUTA taxes it paid during the relevant tax periods.  Section 6511(a) provides that a claim for credit or refund of an overpayment of any tax must be filed within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever is later.  However, Section 3503 provides that with regard to FICA, any tax paid for which the taxpayer was not liable shall be credited against the correct tax imposed (RRTA) and that the balance, if any, shall be refunded.  Accordingly, Trans-Serve is entitled to a full credit and/or refund for all FICA taxes erroneously paid. See also Treas. Reg. § 31.3503-1; Rev. Rul. 84-98.

While the Internal Revenue Code does not permit the crediting of payments erroneously made by the taxpayer under FUTA toward a taxpayer's RURTA tax liability, such crediting may be permissible under the doctrine of equitable recoupment.  That doctrine generally allows the setoff of an otherwise time-barred tax claim against an opposing claim of the same nature that arose from the same transaction or occurrence as the time-barred claim.  See Bull v. United States, 295 U.S. 247 (1935); Frederick v. United States, 386 F.2d 481, 488 (5th Cir. 1967).  A claim of equitable recoupment will lie only where the government has taxed a single transaction or taxable event under two inconsistent theories.  United States v. Dalm, 494 U.S. 596, 605 n.5 (1990).  That is precisely the situation before the Court.  Accordingly, the Court finds that Trans-Serve is entitled to a credit against its RURTA tax liability for any FUTA taxes erroneously paid for the same tax periods, plus interest.

## CONCLUSION

For the foregoing reasons, the Court finds that Trans-Serve is liable as an employer pursuant to the Railroad Retirement Tax Act and the Railroad Unemployment Repayment

Tax Act for the calendar tax periods ending December 31, 1987 through December 31, 1996, inclusive. Trans-Serve is therefore liable for RRTA and RURTA taxes for those time periods, along with interest and penalties. Trans-Serve is also liable for statutory interest accrued on the failure-to-pay penalties assessed for tax periods 1987 and 1988. Pursuant to 26 U.S.C. § 3503, Trans-Serve is entitled to a credit and/or refund for all taxes paid, plus interest, pursuant to the Federal Insurance Contributions Act for those time periods. Pursuant to the doctrine of equitable recoupment, Trans-Serve is also entitled to a credit against its RURTA tax liability for the amount of taxes paid, plus interst, pursuant to the Federal Unemployment Tax Act for the same tax period.

**IT IS SO ORDERED.**

**THUS DONE AND SIGNED** in Shreveport, Louisiana this 8th day of September, 2006.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE